|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    vs.<br><br>MIGUEL ANGEL ORTA-MARTINEZ,<br><br>    Defendant. | DOCKET NO. 3:25-cr-229-MOC |

## DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

In a single count indictment, the government alleges Miguel Orta-Martinez violated § 922(g)(5)(a) which prohibits firearm possession by an "alien"[1] who "is illegally or unlawfully in the United States."[2] The government, however, cannot prove that Orta-Martinez is "illegally or unlawfully" in the United States—because he is not. Rather, Orta-Martinez arrived at a United States port of entry as an "unaccompanied alien child" or a UAC. There, he applied for admission to the United States and was deemed an asylee. In accordance with U.S. immigration law, the Department of Homeland Security (DHS) brought Orta-Martinez into the country and transferred

---

[1] Throughout statutes and case law, the terms "alien" and "noncitizen" are used interchangeably. Because the term "alien" is a legally significant term, counsel uses it to map the language of the relevant statutes when necessary and otherwise uses the term "noncitizen" in a manner consistent with the United States Supreme Court.

[2] Section 922(g)(5)(b) prohibits firearm possession by aliens who have "been admitted to the United States under a nonimmigrant visa" subject to certain exceptions. Because the government has not charged Orta-Martinez under this provision of the statute, it is not addressed herein.

him to the Department of Health and Human Services (HHS)—the agency charged with the care of noncitizen children. HHS then sent Orta-Martinez to live with a sponsor—his brother in North Carolina.

As the Supreme Court recognized in *Biden v. Texas*, DHS has three options when an alien from Mexico seeks entry into the United States—return that person to Mexico immediately, place them in detention, or grant parole (i.e., release into the United States). 597 U.S. 785, 814–15 (2022) (Kavanaugh, J., concurring). Orta-Martinez's release indicates he was paroled into the United States and was, therefore, lawfully present.

Despite his lawful status, the government charged Orta-Martinez with a status crime that turns on whether he was in the U.S. illegally or unlawfully. But Orta-Martinez does not fall within § 922(g)(5)'s prohibited status. The government erred in charging him for a crime he did not commit. And the indictment must be dismissed. Fed. R. Crim. Pro. 12(b)(3)(B).

The problems with the indictment do not end there, however. In addition to its status problem, the government has a *Rehaif* issue—they cannot prove Orta-Martinez knew he was a prohibited person under § 922(g)(5). And because the immigration laws underpinning the § 922(g)(5) analysis are so unclear, so convoluted, and the processes for aliens so in flux that, § 922(g)(5) is unconstitutionally vague as applied to Orta-Martinez.

# BACKGROUND[3]

On January 8, 2023, Miguel Orta-Martinez walked up to the United States port of entry at the International Bridge in Brownsville, Texas. Birth certificate in hand, Orta-Martinez showed U.S. officials that he was a Mexican citizen and only 16 years old. After an initial conversation, Customs and Border Patrol's (CBP) sent Orta-Martinez to secondary inspection site. During this process, Orta-Martinez explained that he "was forced to smuggle drugs for a group named TBURON … in Matamoros [Mexico]."[4] Orta-Martinez also disclosed that he had already been caught by CBP in the past, and they returned him to Mexico. But then TBURON "came to his house, and he was able to get away." Orta-Martinez told agents he was "in fear for his life" if he was forced to return to Mexico.

Based on this information, Orta-Martinez was deemed an asylee and an unaccompanied alien child (UAC). And this time, he was not returned to Mexico. Rather,

---

[3] Information contained in the background is taken from the government's discovery disclosure. Attached hereto as Exhibit A. Prior to filing this motion, counsel for Orta-Martinez conferred with counsel for the United States and specifically requested a full and complete copy of Orta-Martinez's "Alien file" colloquially called the "A-file" and a full and complete copy of all HHS records. Based on the undersigned's understanding of the documents that *should* be contained in the A-file and HHS records, these documents are discoverable under Rule 16. The files almost certainly contain *Brady*/*Giglio* information as well which must be disclosed both pursuant to case law and this Court's Rule 5(f) order. *See* Dkt. No. 5.

[4] Based on information and belief, "Tburon" is a nickname for a faction of the Gulf Cartel a.k.a. Cartel del Golfo (CDG) located in Matamoros—Orta-Martinez's hometown. CDG was designated a Foreign Terrorist Organization by the State Department which describes the organization as "a violent transnational organization based in northeast Mexico involved in drug trafficking, kidnapping, extortion, human smuggling, and other illicit activities. CDG employs violence, including assassinations of civilians and government officials to intimidate the public and control territory." *Designation of International Cartels*, U.S. State Department, February 20, 2025, [https://www.state.gov/designation-of-international-cartels/].

in accordance with laws in place to protect vulnerable noncitizen children, Orta-Martinez was transferred to the HHS's Office of Refugee Resettlement. (ORR). Unfortunately, this is where the government's discovery falls off, but the law fills in the gaps. United States immigration law charges ORR with ensuring noncitizen children are placed in the "least restrictive setting" while they await the resolution of their immigration proceedings. 8 U.S.C. § 1232(c)(2)(A). This includes placement with a sponsoring family member who is in the United States. That is what happened here. At some point after his transfer to ORR, the agency sent Orta-Martinez to live with his brother in North Carolina.

Over two years later, the federal government charged Orta-Martinez under 18 U.S.C. § 922(g)(5)—claiming he possessed a firearm as an "alien" "illegally or unlawfully" in the United States. *See* Indictment, Dkt. No. 1. Orta-Martinez now moves to dismiss the indictment against him, because contrary to the government's claim, he was lawfully present in the U.S.

## ARGUMENT

In some cases, a person clearly falls within the ambit of a prohibited person under § 922(g)(5). This is not one of those cases. Orta-Martnez arrived at a United States port of entry, presented himself to officials, and as a UAC and asylee, was brought into the country while he awaited the resolution of his immigration proceedings. To understand how § 922(g)(5) applies to Orta-Martinez, we have to understand what all this means for his status in the United States.

Four key immigration statutes and their corresponding CFRs work together to address the apprehension, detention, and release of aliens, including unaccompanied children and asylees. First, **8 U.S.C. § 1225** speaks to the apprehension of aliens in general, those from contiguous countries (i.e. Mexico and Canada), and asylees. And under **8 U.S.C. § 1182(d)(5)(A)**, Congress granted authority to DHS to parole, or release, noncitizens into the United States pending the disposition of their immigration cases.[5]

But because children, especially unaccompanied children, are particularly vulnerable, Congress enacted a series of laws designed to provide heightened protection to noncitizen children. For purposes of Orta-Martinez's case, **6 U.S.C. § 279** and **8 U.S.C. § 1232** are pertinent. Section 1232 acts as an addendum to § 1225 and specifically addresses the arrival of unaccompanied children from contiguous countries. Section 279 addresses a child's care, placement, and release while they await the resolution of their immigration proceedings.

Based on these statutes and interpreting case law, the government has three problems with its case:

1. The government's case fails as a matter of law because it cannot prove that Orta-Martinez is a prohibited person under § 922(g)(5).

2. The government cannot establish that Orta-Martinez, a child brought into the United States by the federal government as a UAC and asylee—knew he was a prohibited person under § 922(g)(5).

---

[5] The statutes cited confer authority to different agencies—sometimes Immigration and Naturalization Service (INS)—a now defunct agency, the Attorney General, and DHS. After September 11, 2001, and as immigration laws evolved over time, agency authority was redelegated. For the sake of clarity and efficiency, Orta-Martinez does not follow each line of redelegation, but if the Court would like additional briefing, Orta-Martinez will certainly detail the transfers of authority.

3. Section 922(g)(5) is void for vagueness as applied to Orta-Martinez.

As a note for the Court: the process of determining Orta-Martinez's status for his counsel—fully fluent in English, with a law degree, and a seasoned practitioner—is akin to Alice's tumble down the rabbit hole. As this Court has likely experienced, in the world of immigration law, each statute references several separate statutes and CFRs that, in turn, cite to their own set of statutes and CFRs, and so on. The overlay, of course, is the ever-changing list of executive orders, memos, and often un-written practices implementing (or not) these laws. The point here is twofold: (1) Orta-Martinez, through counsel, does his best to streamline the arguments, and in doing so omits references to statutes and CFRs with no direct bearing on the issues presented, and (2) the complexity of the immigration system underscores Orta-Martinez's *Rehaif* and vagueness arguments. If counsel and Courts are left struggling to make sense of the applicable law (and possibly remain uncertain about its application to a specific individual) how is a child, more specifically *this* child, supposed to know his status.

I. **The government cannot establish that Orta-Martinez was illegally or unlawfully in the United States as required under § 922(g)(5).**

Section 922(g)(5)(a) proscribes firearm possession by an "alien" who is "illegally or unlawfully" in the United States. The statute, itself does not define what it means to be in the United States "illegally or "unlawfully," but courts such as the Seventh Circuit have incorporated language from the corresponding CFR to define the term "unlawfully." It states: "Aliens who are unlawfully in the United States are not in

valid immigrant, nonimmigrant, or parole status." 27 C.F.R. § 478.11; *see also* Fed. Crim. Jury Instr. 7th Cir. 922(g)(5)[1] (2023 ed.). The CFR further provides an inexhaustive list of examples. Just as with § 922(g)(5) the CFR does not define what it means to be "illegally" in the United States. So without much guidance, Orta-Martinez's status only becomes clear after taking a deep dive into the statutes applicable to arriving aliens. From there, it is clear that he does not fall within § 922(g)(5)'s scope.

When a noncitizen arrives in the United States, specifically when that noncitizen is an unaccompanied alien child, three statutes outlining how to handle arriving aliens are triggered—8 U.S.C. § 1225,[6] 8 U.S.C. § 1232,[7] which, as mentioned, serves an addendum to § 1225, and 6 U.S.C. § 279.[8] And where a person is released, or paroled, into the United States pending their immigration proceedings, a separate statute—8 U.S.C. § 1182(d)(5)(A)[9]—is triggered as well. Taken together, these four statutes explain: (1) why Orta-Martinez was deemed an asylee when he arrived at the port of entry, (2) that as an asylee, Orta-Martinez was lawfully present in the United States, and (3) apart from his status as an asylee, as a UAC Orta-Martinez was paroled into the United States and, therefore, lawfully present.

**In general**. Section 1225(a)(1), in pertinent part, explains that an alien arriving in the United States, including those arriving at a port of entry, are treated as

---

[6] Section 1225 applies to all aliens, including children.

[7] Section 1232 applies only to children.

[8] Section 279 applies only to children.

[9] Section 1182 applies to all aliens, including children.

7

applicants for admission. And under § 1225(a)(3), all applicants must be inspected by immigration officers. As a part of this inspection, aliens are screened. Where an alien is inadmissible because they lack the necessary documents to enter the United States, such as a passport or visa, they "shall" be removed "without further hearing or review unless the alien indicates either an intention to apply for asylum … or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i).

**Asylum**. Where an inadmissible alien seeks asylum or expresses a "fear of persecution" the inspecting officer "shall refer the alien for an interview by an asylum officer." 8 U.S.C. § 1225(b)(1)(A)(ii). After the interview with an asylum officer, the alien "shall" be ordered removed if the officer determines he "does not have a credible fear of persecution." § 1225(b)(1)(B)(iii)(I). A "credible fear of persecution" "means that there is a significant possibility … that the alien could establish eligibility for asylum[.]" 8 U.S.C. § 1225(b)(1)(A)(ii). So where an alien *does* establish a credible fear of persecution, they are not immediately removed.

Applying these statutes here, the government's Form I-213 reflects that Orta-Martinez arrived at a port of entry where he was deemed an asylee.

| City, Province (State) and Country of Birth MATAMOROS, TAMAULIPAS, MEXICO | AR ☐ | Form : (Type and No.) Lifted ☐ Not Lifted ☐ NONE | By NELSON, Jaime CBP OFFICER | |
|---|---|---|---|---|
| NIV Issuing Post and NIV Number None | | Social Security Account Name None | Status at Entry Asylee | Status When Found TRAVEL/SEEKING |
| Date Visa Issued None | | Social Security Number None | Length of Time Illegally in U.S. At Entry | |
| Immigration Record NEGATIVE | | Criminal Record None Known | | |

And the Form I-831 reflects the basis for Orta-Martinez's "credible fear" of persecution that resulted in his designation as an asylee:

> **Motivation / CBP Form 93:**
>
> The child stated that he was forced to smuggle drugs for a group name TBURON that reside in Matamoros, MX. Subject also stated that he was caught by Border Patrol in December 2022 and returned to Mexico. Subject continued to state that the TBURON came to his house, and he was able to get away. Subject stated that he is in fear for his life to return to Mexico. Subject does not have any family in the United States.
>
> Based on interview, physical appearance, and behavior, the UAC does not appear to be a victim of trafficking.

"U.S. law provides arriving asylum seekers the right to remain in the United States while their claim for protection is pending[.]" AM. IMMIGRATION COUNCIL, ASYLUM IN THE UNITED STATES FACT SHEET, May 9, 2025, [https://www.americanimmigrationcouncil.org/fact-sheet/asylum-united-states/]. So based on his designation as an asylee, Orta-Martinez had the right to remain in the United States. Stated differently, he was neither illegally nor unlawfully in the United States.

**Parole.** In general, aliens who are applicants for admission into the United States are detained under § 1225(b)(2)(A) or, in the case of aliens from Mexico and Canada, returned to their home country pending immigration proceedings in the United States. 8 U.S.C. § 1225(b)(2)(C). Similarly, when it comes to UACs, § 1232 also allows for the immediate return of a child from a contiguous country. But the statute limits the circumstances under which they may be returned. Specifically, and in pertinent part, § 1232 prohibits the immediate return of a UAC from a contiguous country where the child has "a fear of returning to [their] country of nationality or of last habitual residence owing to a credible fear of persecution"—language mirroring § 1225's asylum considerations.

9

Detention and immediate return are not the only two options, however. The government's third option is parole. *Biden v. Texas*, 597 U.S. 785, 814–15 (2022) (Kavanaugh, J., concurring) (citing 8 U.S.C. § 1182(d)(5)(A)). Parole is essentially release from a detention facility that allows an alien "to be physically present in the United States." U.S. Citizenship and Immigration Services, https://www.uscis.gov/glossary-term/51412, (last visited February 4, 2026).

Where a noncitizen child, such as a UAC, remains in the United States (i.e., they are not immediately sent back to their home country), DHS must comply with § 1232 and 6 U.S.C. § 279 which detail a heightened level of care for children. Together, these statutes establish that DHS (i.e., Customs and Border Patrol and Immigration and Customs Enforcement) shall transfer the care of a UAC to HHS. From there, HHS "promptly" places a child in the "least restrictive setting that is in the best interest of the child," 8 U.S.C. § 1233(c)(2). HHS placement may include releasing a child to a non-detained family member. This is an extension of DHS's authority to grant parole on a "case-by-case basis for urgent humanitarian reasons[.]" 8 U.S.C. § 1182(d)(5)(A). As explained in the corresponding CFR, "The parole of aliens [including UACs] would generally be justified only on a case-by-case basis for 'urgent humanitarian reasons' or 'significant public benefit,' provided the aliens present neither a security risk nor a risk of absconding[.]" 8 C.F.R. § 212.5(b)(3). The guidance continues, stating, "Minors may be released to a parent, legal guardian, or adult relative (brother, sister, aunt, uncle, or grandparent) not in detention." 8 C.F.R. §

10

212.5(b)(3)(i).[10] In sum, when HHS releases a UAC from detention into the care of a non-detained family member, the child is paroled into the United States.

Taken together, and applied to Orta-Martinez, we see that Orta-Martinez arrived at a United States port of entry as a UAC. There, DHS found he had a "credible fear" and thus qualified as an asylee *and* UAC who could not be immediately returned to Mexico. This is evidenced in DHS's Form I-831. From there, DHS transferred Orta-Martinez to the Office of Refugee Resettlement (ORR), the division of HHS that directly handles the care of UACs. HHS then paroled Orta-Martinez into the United States when they sent him to live with his brother in North Carolina.

Going back to the language of § 922(g)(5) and 27 C.F.R. § 478.11, Orta-Martinez, as a UAC and asylee paroled into the United States, was legally and lawfully present. He was not a prohibited person under § 922(g)(5). And the government charged, arrested, and detained Orta-Martinez for a crime he did not commit.

II.    **The government cannot establish that Orta-Martinez *knew* he was illegally or unlawfully in the United States as required under § 922(g)(5).**

Congress and the courts disfavor criminal laws that lack a mens rea or scienter requirement. Section 922(g)(5) is no different. In its *Rehaif* decision, the Supreme Court applied the "presumption in favor of scienter" to § 922(g)(5) and held "the Government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a

---

[10] Section 1182(d)(5)(A) states that DHS has the authority to grant parole. When it comes to noncitizen children, through 6 U.S.C. § 279, Congress transferred the functions of care and placement—including the release of UACs—from the INS (now DHS) to HHS.

firearm." *Rehaif v. United States*, 588 U.S. 225, 229, 237 (2019). The Court explained that a defendant must *know* of his unlawful or illegal immigration status at the time he possesses a firearm because otherwise he "does not have the guilty state of mind that [§ 922(g)(5)'s] language and purposes require." *Id*. at 235.

For Orta-Martinez this means that, even if the Court is unsure about his immigration status or believes he was a prohibited person under § 922(g)(5), the government's case still fails. The government cannot establish another key element of the crime—that *Orta-Martinez* knew he was "illegally or unlawfully in the United States."

Take the evidence described above. Orta-Martinez arrived at a port of entry, as an unaccompanied child who only spoke and understood Spanish. The United States government labeled Orta-Martinez an asylee, brought him into the country, and transferred him to the Office of Refugee Resettlement. ORR then sent Orta-Martinez to live with his brother in North Carolina. Years later, after an incident with a firearm, the government, for the first time since sending him to North Carolina, alleged that Orta-Martinez was in United States illegally or unlawfully. But within the government's own evidence, there is no indication that, at any point, any immigration official explained Orta-Martinez's immigration status to him, much less that his status was considered "illegal" or "unlawful." And as this Court well knows, the complexity of the United States immigration system is the subject of much litigation and controversy.

On this front as well—whether Orta-Martinez understood his status—the government's indictment fails, and its case must be dismissed.

**III. Section 922(g)(5) is unconstitutionally vague as applied to Orta-Martinez.**

"[A] vague law is no law at all." *United States v. Davis*, 588 U.S. 445, 447 (2019). And the Fifth Amendment ensures that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. The "[g]overnment violates this guarantee by taking [someone's liberty under] a law so vague, that it fails to give ordinary people fair notice of the conduct it punishes or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 596 (2015) (citing *Kolender v. Lawson*, 461 U.S. 352, 357-358 (1983)).

A statute is void for vagueness, as applied, where "the terms and judicial constructions of a statute may make it apply unquestionably to certain activities, [but] its application to other activities may remain uncertain due to the absence of a stated standard for inclusion or exclusion of activities from its scope." *United States v. Salisbury*, 983 F.2d 1369, 1378 (6th Cir. 1993) (finding a statute void for vagueness, as applied, where the plain language, judicial interpretation, and legislative history failed to clearly proscribe defendant's conduct) (citing *Smith v. Goguen*, 415 U.S. 566 (1974)).

Here, the statute as-applied to Orta-Martinez is vague. While some non-citizens clearly fall within the scope of § 922(g)(5), Orta-Martinez is not one of them. For Orta-Martinez—a UAC and asylee released into the United States pending the resolution of his immigration proceedings—§ 922(g)(5) does not stand alone. Rather, it

13

necessarily incorporates a labyrinth of immigration laws, orders, memos, regulations, and judicial opinions that, read together, determine whether Orta-Martinez is "illegally or unlawfully in the United States" and therefore a prohibited person. But as noted above, even counsel for Orta-Martinez struggled to make sense of the applicable immigration laws. And while Orta-Martinez and counsel are now confident Orta-Martinez does *not* fall within § 922(g)(5)'s snare, if this is incorrect, certainly an "ordinary" person, presumably untrained in the law, would be unable to make heads or tails of their status. This problem hits at the heart of 922(g)(5)'s uncertainty as applied to Orta-Martinez and those like him, children who present themselves at a port of entry and are released into the country as asylee designees. Where a person's lawful presence is unclear, their status as a prohibited person is unclear. And, in turn, the enforcement of § 922(g)(5) against them is unclear, it is arbitrary and—given the flux of immigration law— it is standardless. This, is a due process violation of the most basic sort. And it renders § 922(g)(5) vague as applied to Orta-Martinez.

## CONCLUSION

The government's indictment fails on three fronts. It fails to state a claim because Orta-Martinez is not a prohibited person under § 922(g)(5). The government cannot establish that Orta-Martinez knew he was a prohibited person under the statute, and § 922(g)(5) is unconstitutionally vague as applied to Orta-Martinez. On all or any one of those fronts, the indictment must be dismissed.


Respectfully submitted:

s/ _____

14

Carson Smith  
Assistant Federal Defender  
N.C. Bar No. 50997  
Federal Public Defender's Office  
129 West Trade Street, Suite 300  
Charlotte, NC 28202  
(704) 374-0720  
(704) 374-0722  
carson_smith@fd.org  

***Attorney for Miguel Angel Orta-Martinez***

Date: February 6, 2026